**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHEN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **SAINT FRANCIS HOME MEDICAL EQUIPMENT, L.L.C.,** an Oklahoma limited liability company, )<br>)<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>**SUNRISE MEDICAL HHG, Inc.,** a California corporation, and **DEVILBISS HEALTH CARE, INC.,** )<br>)<br>)<br>)<br>Defendants. ) | Case No. 08-CV-224-TCK-PJC |

**OPINION AND ORDER**

Before the Court is Defendants' Motion to Dismiss Plaintiff's Complaint, or, in the Alternative, Transfer Venue (Doc. 21), wherein Defendants Sunrise Medical HHG, Inc. ("Sunrise") and DeVilbiss Health Care, Inc. ("DeVilbiss") (collectively "Defendants") move the Court to dismiss the action or, alternatively, transfer the action to the United States District Court for the Southern District of California.

**I.      Factual Allegations in Complaint**

Plaintiff Saint Francis Home Medical Equipment, L.L.C. ("Saint Francis") is in the business of selecting, delivering, setting up, and maintaining medical equipment in customers' homes. Sunrise is a manufacturer of home care products, including DeVilbiss-brand oxygen concentrator equipment. Between June 2005 and October 2006, Saint Francis began purchasing DeVilbiss 515A oxygen concentrator equipment ("Concentrators") from Sunrise for use in its customers' homes.

1

According to the Complaint, Saint Francis purchased the Concentrators "by purchase orders." (Compl. ¶ 10.)

Saint Francis alleges that, as a result of "numerous failures, defects and nonconformities inherent in the [Concentrators] . . ., Defendants' inability to cure the failures and defects . . ., and in consideration of its customers' health and safety, Saint Francis completely lost confidence in the ability of the [Concentrators] to function properly." (*Id.* ¶ 20.) On or about August 17, 2007, Saint Francis advised Sunrise in writing that "it was timely revoking its acceptance of all [Concentrators] it had purchased" and "caused the removal of every [Concentrator] that it had placed in its customers' homes and returned a majority of them to Defendants." (*Id.* ¶ 21.) Saint Francis asserts four claims: (1) declaratory relief that (a) it has not accepted the Concentrators under relevant provisions of Article 2 of the Oklahoma Uniform Commercial Code, Okla. Stat. tit. 12A, § 2-201, *et seq.* ("OUCC"), (b) that it rightfully revoked its acceptance under the OUCC, and (c) that it is entitled to return of the purchase price and damages;[1] (2) breach of contract;[2] (3) breach of written warranty;[3] and (4) breach of the implied warranty of merchantability.

Defendants moved to dismiss or transfer the action based on a forum selection clause in a document entitled "Terms and Conditions Sale," which is part of the record and which Defendants allege was attached to every invoice received by Saint Francis in connection with its Concentrator

---

[1] The parties agree that Concentrators are "goods" governed by Article 2 of the Uniform Commercial Code ("UCC") and its state-law equivalents, such as the OUCC.

[2] The Complaint does not specify what contract was breached.

[3] The Complaint does not specify what document contains the written warranty allegedly breached.

purchases. Saint Francis argues that, under Oklahoma law, the forum selection clause never became a term of the relevant purchase agreements.

**II.     Rule 12(b)(3) Standard**

In the Tenth Circuit, motions to dismiss based on a forum selection clause are analyzed as motions to dismiss for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3). *See K & V Scientific Co., Inc. v. Bayerische Motoren Werke Aktiengesellschaft,* 314 F.3d 494, 497 (10th Cir. 2002); *Riley v. Kingley Underwriting Agencies, Ltd.*, 969 F.2d 953, 956 (10th Cir. 1992); *Meyers v. Keycorp*, No. CIV-07-1166, 2008 WL 2557991, at * 3 (W.D. Okla. June 23, 2008); *see generally* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1352 (3d ed. 2004) [hereinafter *Federal Practice*] (explaining circuit split as to whether motions to dismiss based on a forum selection clause are governed by Rule 12(b)(3) or (6)). With respect to the burden of proof applicable to a Rule 12(b)(3) motion, the Tenth Circuit appears to follow the majority rule that a plaintiff bears the burden of proving proper venue, just as a plaintiff bears the burden of proving personal jurisdiction. *See Pierce v. Shorty Small's of Branson*, 137 F.3d 1190, 1192 (10th Cir. 1998) (affirming district court's dismissal for improper venue where defendant controverted facts in plaintiff's complaint regarding venue, and plaintiff failed to come forward with any contrary evidence); *see also* 5B *Federal Practice* § 1352 (explaining that, although there is circuit split as to which party bears the burden of proof, the better view is that the plaintiff bears the burden because "it is the plaintiff's obligation to institute his action in a permissible forum, both in terms of jurisdiction and venue") (citing *Pierce*, 137 F.3d 1190)).

In order to meet his burden at the motion to dismiss stage, a plaintiff must "present only a prima facie showing of venue." *Home Ins. Co. v. Thomas Indus. Inc.*, 896 F.2d 1352, 1355 (11th

Cir. 1990) (cited with approval in *Pierce*, 137 F.3d at 1192)); *M.K.C. Equip. Co. v. M.A.I.L. Code, Inc.*, 843 F. Supp. 679, 682 (D. Kan. 1994). In assessing whether a plaintiff has met his burden, the facts alleged in a plaintiff's complaint are taken as true, but only to the extent they are uncontroverted by defendant's evidence. *Pierce,* 137 F.3d at 1192; *Meyers*, 2008 WL 2557991, at * 3 ("When a defendant moves for dismissal and presents facts to establish improper venue, the plaintiff must present evidence that controverts the facts shown by the defendant, or dismissal is proper."). If the parties do present conflicting evidence, "the court is inclined to give greater weight to the plaintiff's version of jurisdictional facts and to construe such facts in the light most favorable to the plaintiff." *Home Ins. Co.*, 896 F.2d at 1355; *M.K.C. Equip.* Co., 843 F. Supp. at 683 (explaining that "all factual disputes should be resolved in favor of plaintiff"); 5B *Federal Practice* § 1352 (same); *cf. Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1130 (10th Cir. 1991) (stating same rules in context of personal jurisdiction analysis). The Court's consideration of evidence outside the pleadings does not convert the Rule 12(b)(3) motion to one for summary judgment. *See Continental Cas. Co. v. American Nat'l Ins. Co.*, 417 F.3d 727, 733 (7th Cir. 2005) ("Under Rule 12(b)(3), the district court was not obligated to limit its consideration to the pleadings nor to convert the motion to one for summary judgment."); *Topliff v. Atlas Air, Inc.*, 60 F. Supp. 2d 1175, 1176 (D. Kan. 1999) ("The court has found nothing in the Federal Rules of Civil Procedure that makes Rule 56 applicable to motions filed under Rule 12(b)(2) and (3) when matters outside of the pleadings are presented."); 5B *Federal Practice* § 1352 (same).

**III.    Motion to Dismiss or Transfer**

The issue presented on this motion to dismiss or transfer for improper venue is whether the parties' purchase contracts for Concentrators, entered between June 2005 and October 2006, include a forum selection clause.[4]

    A.    <u>Evidentiary Record Presented on Motion to Dismiss</u>

In their motion, Defendants presented the affidavit of Joseph E. Olsavsky ("Olsavsky") ("Olsavsky Affidavit"), DeVilbiss Vice President of Global Quality & Regulatory Affairs, who declared in relevant part that (1) the relevant "purchase orders" referenced in the Complaint were Sunrise purchase orders; (2) "[a] true and correct copy of the purchase order used to purchase the [Concentrators] is attached hereto as Exhibit 'A';" and (3) "[t]here were no other purchase orders used." (Defs.' Mot. to Dismiss, Ex. 1.)  Exhibit A to the First Olsavsky Affidavit is not a typical "purchase order" but is instead a blank invoice imprinted with the Sunrise logo.  Also part of Exhibit A is a one-page document entitled "Terms and Conditions Sale" ("Terms of Sale").  The Terms of Sale is not signed by Saint Francis or Sunrise, nor is it referenced in the blank invoice.  The final paragraph of the Terms of Sale, entitled "Miscellaneous," provides that "[t]he parties submit to the exclusive jurisdiction of state and federal courts in San Diego, California and waive any right to trial before a jury" ("Forum Selection Clause").  (Defs.' Mot. to Dismiss., Ex. A to Ex. 1)

In its response, Saint Francis presented the affidavit of Rodney Buck ("Buck") ("Buck Affidavit"), corporate counsel for Saint Francis, who declared in relevant part:

---

[4] The parties agree that all purchase contracts entered during this time frame are subject to the same analysis.  Therefore, neither party urges the Court to conduct a purchase-by-purchase inquiry to determine the relevant terms of each contract.

5

> In 2005, Saint Francis decided to purchase Concentrators from Defendants and did so until October of 2006. These purchases were made by purchase orders during this time, which Saint Francis sent directly to Sunrise. Saint Francis' purchase order did not contain a forum selection clause. After Saint Francis sent a purchase order to Sunrise, it promptly shipped the Concentrators to Saint Francis' place of business in Tulsa. Saint Francis accepted delivery of the Concentrators and began placing most of them in its customers' homes. At the time of shipment, Sunrise also sent Saint Francis an invoice for the purchase, but to a different address than the Concentrators. Saint Francis, at no time during its relationship with Sunrise, ever expressly consented to California as the exclusive forum to resolve any disputes related to the purchase of Concentrators. Sunrise never asked for such consent or agreement and Saint Francis never gave consent or accepted such a term. Moreover, it was never Saint Francis' understanding, nor was it ever communicated to Saint Francis by Sunrise, that Sunrise's willingness to sell Concentrators to Saint Francis was contingent on the purported forum selection clause in Sunrise's invoices. Had Saint Francis known that any purchases of Concentrators from Sunrise would be accompanied by a forum selection clause, it would have refused to order Concentrators from Sunrise or negotiated different terms.

(Pl.'s Resp. to Defs.' Mot. to Dismiss, Ex. A at ¶¶ 5-9.) Saint Francis did not attach any relevant purchase orders that were allegedly "sent" to Sunrise.

In their reply, Defendants objected to the Buck Affidavit as inadmissible hearsay because Buck did not declare that he is Saint Francis' custodian of records or that he was the individual who issued the purchase orders or received the Sunrise invoices. Apparently aware that Olsavsky, who is not even employed by Sunrise, could face a similar objection with respect to his ability to testify as to Sunrise business documents, Defendants submitted the Affidavit of Owen Thomas ("Thomas") ("Thomas Affidavit"), the custodian of records for Sunrise. Thomas declared:

> St. Francis never provided any terms or conditions, written or verbal, when ordering DeVilbiss oxygen concentrators from Sunrise. All St. Francis purchases were made by telephone calls, emails, or fax to the Sunrise offices for purchase of Sunrise equipment. The calls were placed with Sunrise using a St. Francis purchase order number and immediately given a Sunrise invoice number. The orders were taken by Sunrise at the time of the call, facsimile, or email was made and in the course of Sunrise business. The Sunrise account records kept by Sunrise in the ordinary course of business are attached hereto as Exhibit A. For each order placed by St. Francis, the standard Sunrise invoice using Sunrise Terms and Conditions are generated at the

> time the order is placed. There are no exceptions to this procedure for any customer of Sunrise. A true and correct copy of the Sunrise invoices for St. Francis purchases appears as Exhibit A to the [Olsavsky Affidavit]. A copy of each invoice generated by a St. Francis order in the ordinary course of business of Sunrise was sent with each order and contained the same Terms and Conditions as they appear in Exhibit A to the [Olsavsky Affidavit]. St. Francis paid Sunrise invoices according to the invoice terms in a timely manner. A true and correct copy of St. Francis' proof of payment received by Sunrise in the ordinary course of its business . . . is attached as Exhibit B to this Affidavit. Sunrise has no record of St. Francis ever questioning or contesting the Terms and Conditions required for Sunrise sales to St. Francis.

(Defs.' Reply in Support of Mot. to Dismiss, Ex. 3 at ¶¶ 4-10.) Exhibit A to the Thomas Affidavit is a report entitled "Customer Order by Invoice/Ship Date," which contains order dates, order numbers, invoice/ship dates, item numbers, and item descriptions for Concentrator orders by Saint Francis from May 23, 2005 through October 18, 2006. Exhibit B is a report entitled "St. Francis Check Listing," which lists a payor, receipt date, and receipt amount for checks received by Sunrise from Saint Francis from March 29, 2004 through November 22, 2008.

Also attached to Defendants' reply is a Supplemental Affidavit of Joseph Olsavsky ("Supplemental Olsavsky Affidavit"), which, in part, offers support for Defendants' evidentiary objection to the Buck Affidavit. Specifically, Olsavsky declared that he visited Saint Francis and met with Buck in February 2008 but that Buck never "represented himself to be knowledgeable in the day to day operations of St. Francis in connection with the purchase or use of the [Concentrators]." (Defs.' Reply in Support of Mot. to Dismiss, Ex. 4 at ¶ 6.) Attached as Exhibit A to the Supplemental Olsavsky Affidavit are emails exchanged between Olsavsky and Buck, which "reflect[] the position of Mr. Buck as he represented himself to [Olsavsky]." (*Id.*) In addition, Olsavsky declared that Buck erroneously refers to the use of a "St. Francis purchase order" because "[a]t no time did St. Francis use or provide a purchase order." (*Id.* at ¶ 7.) Instead, according to Olsavsky, "[t]he only agreed upon term for the purchase by St. Francis of the [Concentrators] from

Sunrise are those found in the Sunrise invoices sent to St. Francis when St. Francis placed an order." (*Id.*)

In a surreply allowed by the Court, Saint Francis did not attach any additional evidence but "clarifie[d]" the Buck Affidavit by explaining that "Saint Francis agrees with Defendants that it ordered Concentrators from Sunrise either by fax, e-mail, or telephone, giving Sunrise a purchase order number each time it did so." (Pl.'s Surreply at 3 n.3.) This "clarification" is essentially an admission that there were never any written purchase orders "sent" from Saint Francis to Sunrise, which was certainly implied in the Buck Affidavit. Saint Francis argues, however, that the method of placing the order – whether by fax, email, or phone – is irrelevant to its substantive argument that the Forum Selection Clause never became a term of the parties' purchase agreements and that any misstatement in the Buck Affidavit has no impact on the Court's analysis. Defendants' response to Plaintiff's surreply contained no additional evidence.

B.      Parties' Arguments

Saint Francis contends that the relevant purchase contracts were formed when Saint Francis (offeror) placed each purchase order (whether by phone, fax, or email), and Sunrise (offeree) accepted Saint Francis' orders for Concentrators by promising to ship and/or shipping the items. Thus, according to Saint Francis, the Forum Selection Clause in the Terms of Sale, assuming such document was attached to the relevant invoices and received by Saint Francis,[5] constitutes an

---

[5] For purposes of its principal argument, Saint Francis invites the Court to assume that it received the Terms of Sale document. Accordingly, the Court assumes without deciding, for purposes of this motion, that Saint Francis received the Terms of Sale document along with relevant invoices sent on dates referenced in Exhibit A to the Thomas Affidavit. The Court observes that, although Buck denied "that the blank Sunrise invoice form . . . is representative of the invoices that Sunrise sent to Saint Francis after any purchases of Concentrators," (*see* Buck Aff. ¶ 10), this is not exactly a denial that Saint Francis received any invoices or that Saint

"additional term," as that phrase is used in OUCC § 2-207(2). Saint Francis then argues that, under the analysis of "additional terms" required by OUCC § 2-207(2), the Forum Selection Clause never became part of the agreements because it constituted a material alteration.

Conversely, Defendants contend that the Terms of Sale document, which includes the Forum Selection Clause was always an original term of the contract and that OUCC § 2-207(2) has no application "as the forum selection clause was never an additional term of acceptance." (Defs.' Reply in Support of Mot. to Dismiss 2-3.) Defendants contend that the Terms of Sale governs because it reflects "those terms on which the writings of the parties agree." *See* OUCC § 2-207(3).[6] As the only "writing" in the record, Defendants argue that the Terms of Sale govern the agreement. (*See* Defs.' Reply in Support of Mot. to Dismiss 4 (arguing that "[t]he only writing embodying the terms for the purchase and sale of the [Concentrators] was the Sunrise invoice" and that Saint Francis' "conduct in accepting the [Concentrators] with the Sunrise invoices and paying for the [Concentrators] according to Sunrise invoice terms for 17 months[,] never once questioning the [Terms of Sale] . . .[,] is the only evidence of the agreed upon terms").

C.   Applicable Law

In determining whether a forum selection clause is part of an agreement, a federal court exercising diversity jurisdiction applies state contract law, rather than federal law. *See Black &*

---

Francis received documents similar or identical to the Terms of Sale, which is the document containing the Forum Selection Clause.

[6] UCC § 2-207 was substantially amended in 2003. *See* UCC § 2-207 (2003 amendments). Oklahoma has not adopted the 2003 amendments. In Defendants' briefs, they quote and refer to the former version of UCC § 2-207, (*see* Defs.' Reply in Support of Mot. to Dismiss 3-4), which is identical to the current version of OUCC § 2-207.

*Veatch Constr'n, Inc. v. ABB Power Generation, Inc.*, 123 F. Supp. 2d 569, 577 (D. Kan. 2000).[7]

As to the question of *which* state's laws to apply, Saint Francis asserted that Oklahoma law applies, and Defendants have not argued for application of any other state's laws.[8]  Instead, Defendants' arguments are based on the general UCC, rather than any particular state's adoption thereof. (*See* Defs.' Resp. to Pl.'s Surreply 2 (citing provisions of UCC as governing law).)  Nor has either party shown or attempted to show that there is a choice-of-law or conflict-of-law issue presented for resolution by the Court. (*See id.* (stating that "[t]here is no dispute between the parties as to the law to be applied to the issue" and citing general UCC provisions); Pl.'s Resp. to Defs.' Mot. to Dismiss (stating that "California, where Sunrise is domiciled, also has adopted Article 2 of the UCC" and that "there is no choice of law problem here").)  Accordingly, the Court will apply the UCC as adopted and interpreted in Oklahoma.[9]

---

[7] The application and enforceability of a forum selection clause is determined under federal law. *See id.*  However, the threshold question of whether the forum selection clause ever became part of the agreement – which is the issue presented in this case – is governed by state law. *See id.*

[8] The Forum Selection Clause contains language indicating that the Terms of Sale document shall be construed in accordance with the laws of the State of California. (*See* Defs.' Mot. to Dismiss, Ex. A to Ex. 1.)  Defendants did not argue that such language mandated application of California law in deciding this motion.  In any event, for reasons explained below, the Court finds that the Forum Selection Clause did not become a term of the parties' agreements.

[9] As explained below, the Oklahoma Supreme Court's interpretation of relevant UCC provisions is important to the Court's decision.  Nonetheless, in the absence of argument from Defendants against application of Oklahoma law, the Court sees no reason to engage in an extensive choice-of-law analysis. *See Rogers v. Dell Computer Corp.*, 138 P.3d 826, 831 (Okla. 2005) (explaining that there was no choice-of-law problem where neither party maintained that there was any difference in the two potentially applicable laws).  Further, based on the current record, Oklahoma law would likely prevail were the court to conduct a choice-of-law inquiry. *See Black & Veatch Constr'n, Inc.*, 123 F. Supp. 2d at 577 (district court applies the choice of law rules of the state in which it is sitting; *Cuesta v. Ford Motor Co.*, 209 P.3d 278, 285 (Okla. 2009) (in cases for breach of warranty arising under UCC, Oklahoma follows Restatement

D.     Formation of Contract - OUCC § 2-206

Because it presents strikingly similar facts, the Court begins with an explanation of the Oklahoma Supreme Court's decision in *Rogers v. Dell Computer Corporation*, 138 P.2d 926 (Okla. 2005). In *Rogers*, the plaintiffs placed orders for computers directly with the defendant, and the defendant shipped the computers. The issue was whether an arbitration provision contained in a "Terms and Conditions of Sale" document, which was allegedly sent to the plaintiffs either with the invoice or with the actual computer, was a term of the purchase contract. The lower court found that the arbitration provision was not a term of the contract and denied the motion to compel arbitration. Based on a lack of evidence regarding the circumstances surrounding placement of the orders, the court found that the "record [was] insufficient to support the order denying" the motion to compel arbitration. *Id.* at 834.[10] The Oklahoma Supreme Court reversed the denial and remanded with instructions to follow the rulings outlined in its decision. *Id.* at 834. Therefore, the court in *Rogers*

---

(Second) of Conflicts § 191 (1971), which provides that disputes are governed by "'the local law of the state where under the terms of the contract the seller is to deliver the chattel unless, with respect to the particular issue, some other state has a more significant relationship . . . to the transaction and the parties, in which event the local law of the other state will be applied'"). Unlike in *Cuesta*, Defendants in this case have not presented evidence or made arguments that any other state has a more significant relationship to the transaction than Oklahoma, where the Concentrators were delivered. Thus, the general rule would likely apply.

[10] There was no evidence in the record regarding "how the plaintiffs ordered the computers, whether over the internet, by mail, or by phone" or regarding "the processes and conversations between Dell and the plaintiffs when they placed their orders or whether the plaintiffs were required to consent to the 'Terms and Conditions of Sale' when placing the orders." *Id.* at 829.

did not issue a factually specific holding.[11] However, it did adopt general principles applicable to this case.

First, the court explained a split of authority regarding whether terms and conditions of sale sent with a purchased item or its invoice are binding on the purchaser and concluded that "[t]he difference in outcome is generally attributable to a court's determination of when the contract was formed." *Id.* at 832. Applying § 2-206(1)(b) of the UCC,[12] the court followed the line of authority holding that terms of sale in a document sent with an invoice or product are generally *not* binding on the purchaser, unless the language and circumstances involved in the transaction unambiguously show that the contract was not formed until *after* the purchaser received the relevant terms and conditions of sale. *See id.* (explaining that the "buyer is the offeror, and a contract is formed when an order is placed and the seller agrees to ship *unless* the language and circumstances involved in the transaction unambiguously show otherwise") (emphasis added); *see also* Okla. Stat. tit. 12, § 2-206(1)(b) ("(1) Unless otherwise unambiguously indicated by the language or circumstances . . . (b) an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or nonconforming goods . . . ."). Therefore, unless the circumstances surrounding a transaction

---

[11] The dissenting judge in *Rogers* accused the majority of issuing an improper advisory opinion. *See id.*, 138 P.3d at 836 (Kauger, J., dissenting) ("If the record were insufficient to support a finding of an agreement to arbitrate, which it is, how could it also be insufficient to support an order which denies an application to compel arbitration? It can't. The order denying the application to compel arbitration was and should have been denied. Here, the decision issued regarding the validity of an arbitration agreement is based on assumed facts and results in an advisory opinion.").

[12] The court did not decide whether it was applying Texas or Oklahoma law because both states had adopted the UCC, and neither party had shown a material difference between the two. *See id.* at 831. In its reasoning, the court referred generally to UCC provisions.

"unambiguously indicate" that the contract was not complete at the time the order was placed, terms of sale sent with an invoice or product shipment must be considered "additional terms" of the contract, which are governed by OUCC § 2-207. *See Rogers*, 138 P.3d at 833.[13] [14]

Based on the above principles in *Rogers*, the timing of contract formation (whether at the time of purchase or at the time of receipt of the invoice/item/terms of sale) impacts the determination

---

[13] In *Rogers*, the Oklahoma Supreme Court aligned itself with the Third Circuit case of *Step-Saver Data Systems, Incorporated v. Wyse Technology*, 939 F.2d 91 (3d Cir. 1991), and other similar cases. In so doing, the Oklahoma Supreme Court answered a question left for state-court resolution by the 2003 amendments to UCC § 2-207. *See* UCC § 2-207 (as amended in 2003) ("[Section § 2-207] omits any specific treatment of terms attached to the goods, or in or on the container in which the goods are delivered. This article takes no position on whether a court should follow the reasoning in *Step-Saver Data Systems, Inc. v. Wyse Technology*, 939 F.2d 91 (3d Cir. 1991) and *Klocek v. Gateway, Inc.* 104 F. Supp. 2d 1332 (D. Kan. 2000) (original 2-207 governs) or the contrary reasoning in *Hill v. Gateway 2000*, 105 F. 3d 1147(7th Cir. 1997) (original 2-207 inapplicable).").

According to the dissenting judge in *Rogers*, by aligning itself with the Third Circuit, the *Rogers* court adopted the "minority view," which "looks to the circumstances surrounding the order of the product; determines when the contract was formed; and then applies § 2-207 of the U.C.C. to determine if the terms included in the packaging are integrated into the contract." *See Rogers*, 138 P.3d at 838 n.9 (Kauger, J., dissenting); *see also Step-Saver Data Sys., Inc.*, 939 F.2d at 104 (cited as representative of minority view). In contrast, the "majority approach recognizes that the contract is formed when the purchaser fails to return a product, under the assumption that the seller is the master of the offer, and holds the purchaser bound by any terms included in the packaging of the product." *Rogers*, 138 P.3d at 838 n.9 (Kauger, J., dissenting); *see also ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1452 (7th Cir. 1996) (cited as representative of majority view).

[14] Prior Oklahoma Supreme Court and Oklahoma Court of Civil Appeals cases are, at least to some extent, in accord with *Rogers*. *See Old Albany Estates, Ltd. v. Highland Carpet Mills, Inc.*, 604 P.2d 849, 852 (Okla. 1980) (holding that "[t]here existed a contract for sale of carpet prior to delivery or receipt of the invoices" and applying § 2-207 to determine if warranty disclaimer contained in invoice became a term of the agreement); *Lively v. IJAM, Inc.*, 114 P.3d 487, 492 (Okla. Civ. App. 2005) (holding that "a contract for sale existed" prior to receipt of the invoice and applying § 2-207 to determine if forum selection clause contained in the invoice became a term of the agreement). *See also infra* n.15 (explaining possible differences between *Lively* and *Rogers*).

13

of the contract's terms. However, the *Rogers* court concluded that it did not have a sufficient evidentiary record to determine the time of contract formation or the contract's terms.

> In this case, the time of formation of the contracts and their terms depend on the conversations and circumstances between Dell and the plaintiffs at the time the orders were placed. *If the language and circumstances were such that when the orders were placed, the contracts were not formed until after the plaintiffs received the "Terms and Conditions of Sale" document, the arbitration provisions would be a term of the contracts. The arbitration provision would also be a term of the contracts if it were incorporated into them at the time the plaintiffs placed the orders.* If the contracts were formed at the time that the orders were placed and the "Terms and Conditions of Sale" document was not incorporated into the contracts, the second question [application of § 2-207(1) and (2)] becomes relevant to the analysis.

*Id.* at 832 (emphasis added).[15]

Applying the principles in *Rogers* to the instant case, the Court begins with the premise that Saint Francis made an offer at the time it placed the purchase orders, whether by phone, fax, or email. The question becomes whether the record "unambiguously indicates" that, at the time the orders were placed, (1) the Forum Selection Clause was discussed by the parties and incorporated into the contracts; or (2) the language and circumstances surrounding the orders were such that the contracts were not formed until after Saint Francis received the invoices and attached Terms of Sale. *See Rogers*, 138 P.3d at 832. If the answer to both questions is no, the Forum Selection Clause is not part of the agreement. If the answer to either question is yes, the Forum Selection Clause is part of the agreement. *See id.*; *see also* Okla. Stat. tit. 12A, § 2-207, Oklahoma Code Comment

---

[15] Citing the italicized language, the "Oklahoma Code Comment" to § 2-207 states that the Oklahoma Supreme Court's "position" in *Rogers* "accords with the great weight of authority and rejects the rigid analysis of Court of Civil Appeals of Oklahoma in *Lively v. IJAM, Inc.*, 114 P.3d 487 (Okla. Civ. App. Div. 4 2005)." Okla. Stat. tit. 12A, § 2-207, Oklahoma Code Comment. Thus, the author of such comment may disagree with Justice Kauger that the majority in *Rogers* followed a "minority view." *See supra* n.14.

(explaining that, pursuant to *Rogers*, "the terms of a record may be adopted after beginning performance or use if the parties had reason to know that their agreement would be represented in whole or in part by a later record to be agreed on and that there would not be an opportunity to review the record or a copy of it before performance or use began").

According to the Buck Affidavit, Saint Francis did not agree to be bound by the Forum Selection Clause at the time of placing the relevant purchase orders. (*See* Buck Aff. ¶¶ 5, 6, 8, 9.) Defendants offered no evidence disputing Buck's testimony that the parties did not discuss the Forum Selection Clause at the time Saint Francis placed the orders. In fact, Thomas' description of the purchase-order process also indicates that the parties did not discuss the Forum Selection Clause or any other terms and conditions of sale. (*See* Thomas Aff. ¶¶ 4-7 ("St. Francis never provided any terms or conditions, written or verbal, when ordering DeVilbiss oxygen concentrators from Sunrise.").) As to the question of whether the parties understood and agreed, at the time the relevant orders were placed, that Sunrise intended to condition its acceptance on the Terms of Sale, there is no specific testimony offered by either party. However, the Thomas Affidavit indicates that there was no discussion of the Terms of Sale at the time the orders were placed. As explained by Thomas, the process was a routine one that did not involve any conditional acceptance or discussion of terms:

> All St. Francis purchases were made by telephone calls, emails, or fax to the Sunrise offices for purchase of Sunrise equipment. The calls were placed with Sunrise using a St. Francis purchase order number and immediately given a Sunrise invoice number. The orders were taken by Sunrise at the time of the call, facsimile, or email was made and in the course of Sunrise business. The Sunrise account records kept by Sunrise in the ordinary course of business are attached hereto as Exhibit A. For each order placed by St. Francis, the standard Sunrise invoice using Sunrise Terms and Conditions are generated at the time the order is placed. There are no exceptions to this procedure for any customer of Sunrise.

(Thomas Aff., ¶¶ 5-8.) Nor did Defendants submit any evidence or argument that the Terms of Sale document itself expressly conditioned acceptance of Saint Francis' offer on Saint Francis' agreement to the Terms of Sale.[16]

Construing all evidence in the light most favorable to Saint Francis and drawing all inferences in its favor, the Court finds that Saint Francis has shown that each purchase contract for Concentrators was completed prior to its receipt of the Terms of Sale. Pursuant to OUCC § 2-206, Saint Francis made offers for purchase upon phoning, emailing, or faxing Sunrise, and Sunrise accepted the offers upon promising to ship and/or shipping the Concentrators. Saint Francis has expressly denied that the terms of such contracts included any agreement to litigate in California, and Defendants have not offered any contrary evidence. Further, the Court finds no evidence supporting an inference that Saint Francis generally agreed, at the time of purchase, to be bound by Terms of Sale to be sent by Sunrise at a later time. Therefore, applying Oklahoma law, the Forum Selection Clause in the Terms of Sale, which was attached to relevant invoices sent at a date after the purchase contracts were formed, is an "additional" term under the OUCC.

Instead of making factual arguments regarding the circumstances at the time the orders were placed, Defendants (1) objected to the Buck Affidavit as hearsay; (2) argued that the Terms of Sale must govern the agreement because they are the only written terms in the record; and (3) argued that Saint Francis' failure to object to the Terms of Sale upon receipt, and Saint Francis' course of conduct in continuing to purchase Concentrators after its first receipt of Terms of Sale, indicates that such terms are part of the contracts. The Court will address each argument in turn. First, the Court

---

[16] Neither party discussed or raised the "Purchase Orders" clause in the Terms of Sale as a conditional acceptance, and the Court does not reach this question.

overrules Defendants' objection to the Buck Affidavit. Although Buck was not the individual who actually placed the orders, Buck, as Saint Francis' corporate counsel, has sufficient personal knowledge of the typical process of ordering the Concentrators to support the declarations contained in his affidavit.[17]

Second, the fact that there is only one "writing," rather than a battle of the forms, does not change the analysis outlined in *Rogers*. In *Klocek v. Gateway, Incorporated*, 104 F. Supp. 2d 1332, 1339 (D. Kan. 2000), a case that is also representative of the approach adopted in *Rogers*, the court expressly rejected the argument that § 2-207 does not apply when there is only one "writing." The court reasoned that, although disputes under § 2-207 often arise in the context of a battle of the forms, "nothing in its language precludes application in a case which involves only one form." *Id.*; *see also* Okla. Stat. tit. 12A, § 2-207, cmt. 1 (explaining that § 2-207 applies "where an agreement has been reached either orally or by informal correspondence . . . and is followed by *one* or both of the parties sending formal memoranda embodying the terms so far as agreed upon and adding terms not discussed") (emphasis added). Thus, the Court finds that the *Rogers* analysis, as more fully explained in *Klocek*, applies regardless of whether the parties exchange writings or whether the invoice/terms of sale sent with the product is the only written agreement in the record.[18]

---

[17] Although certain statements in the Buck Affidavit regarding the purchase orders being "sent" were misleading, Saint Francis clarified in its surreply that the orders were placed by either phone, email, or fax, and the Thomas Affidavit is in accord. In any event, as argued by Saint Francis, this distinction is not relevant to the analysis.

[18] This is in accord with the 2003 amendments to UCC § 2-207. *See* UCC § 2-207, cmt. 1 (as amended in 2003) ("This section applies to all contracts for the sale of goods, and it is not limited only to those contracts where there has been a "battle of the forms.").

Finally, as to Defendants' argument that Saint Francis' continued acceptance of and payment for the Concentrators constitutes acquiescence to the Terms of Sale (*see* Thomas Aff. ¶ 10), this argument was expressly rejected in *Rogers*. *See Rogers*, 138 P.3d at 833 ("The plaintiffs' accepting the computers and not returning them is consistent with a contract being formed at the time that the orders were placed and cannot be construed as acquiescing in the 'Terms and Conditions of Sale' document whether included with the invoice or acknowledgment or with the computer packaging."). In following the Third Circuit and other similar cases, the Oklahoma Supreme Court rejected the line of cases holding that failure to return the product or object to the terms sent with the product constitutes acceptance of such terms. *See id.* at 832 (discussing split in cases and rejecting decisions holding that purchasers manifested an intent to be bound by "accepting delivery of and failing to return the computers").

E.    Additional Term - OUCC § 2-207(2)

Section 2-207(2) of the OUCC provides that "additional terms are to be construed as proposals for addition to the contract." Between two merchants, the terms become part of the contract *unless*: "(a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received." *Id.*[19] Saint Francis relies on OUCC § 2-207(2)(b), arguing that the Forum Selection Clause did not become part of the agreement because it "materially altered" it. Oklahoma and other case law uniformly holds that a forum selection clause constitutes a "material alteration" of the agreement. *See Lively*, 114 P.3d at 493 (finding that a

---

[19] For purposes of this motion, Saint Francis does not dispute that it is a "merchant" under the OUCC.

"forum selection clause materially altered the contract" and was therefore not a part of the contract) (citing numerous cases from other jurisdictions); *Galaxy Int'l, Inc. v. White Stores, Inc.*, 88 F.R.D. 311, 321 (W.D. Pa. 1980) ("We view the addition of a choice of law term to this contract as a significant alteration, and therefore, we rule that it did not become part of the contract."). Further, this legal proposition was not disputed by Defendants, as Defendants argued that the Forum Selection Clause was not an "additional term" at all. Thus, the Court finds that the Forum Selection Clause constituted a material alteration of the agreement.

If an additional term materially alters the bargain, it can still become part of the agreement if it is "expressly agreed to by the other party." *See* Okla. Stat. tit. 12A, § 2-207, cmt. 3. However, as explained above, Saint Francis' evidence indicates that it never expressly agreed to the Forum Selection Clause, and Defendants have not presented any countervailing evidence.[20]

## IV. Conclusion

The Court concludes that, under the OUCC and the *Rogers* decision, the Forum Selection Clause was an additional term, rather than a term of the parties' original agreement. The Court further concludes that the Forum Selection Clause materially altered the bargain and was not expressly consented to by Saint Francis. Accordingly, the Forum Selection Clause never became

---

[20] Defendants' reliance on OUCC § 2-207(3), rather than OUCC § 2-207(2), is misplaced. This provision governs what terms apply when the parties' conduct reflects a contract "although the writings of the parties do not otherwise establish a contract." OUCC § 2-207(3). In such a case, "the terms of the particular contract consist of those terms upon which the parties agree, together with any supplementary terms incorporated under any other provisions of this act." *Id*. In *Rogers*, which presented the precise question at issue here, the court explained that, if the Court deems terms of sale "additional" terms, the remaining analysis is governed by OUCC § 2-207(1) and (2). *See Rogers*, 138 P.3d at 832. The court did not discuss OUCC § 2-207(3) and certainly did not view the terms of sale sent with the invoice or product as "terms on which the writings of the parties agree." *See id.*

19

part of the Concentrator purchase contracts.  Defendants' Motion to Dismiss Plaintiff's Complaint, or, In the Alternative, Transfer Venue (Doc. 21), is DENIED.

**ORDERED this 10th day of August, 2009.**

_____
**TERENCE KERN
UNITED STATES DISTRICT JUDGE**